**Thomas BARROW, Plaintiff–Appellee,**

**v.**

**Lloyd A. FALCK, individually and as Sheriff of Ford County, Illinois, and Ford County, Illinois, Defendants–Appellants.**

**Nos. 90–3425, 91–2937.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 16, 1992.

Decided Oct. 13, 1992.

Edward H. Rawles (argued), Reno, O'Byrne & Kepley, Champaign, Ill., for plaintiff-appellee.

William A. Allison (argued), Bloomington, Ill., for defendants-appellants.

Before BAUER, Chief Judge, EASTERBROOK, Circuit Judge, and WOOD, Jr., Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

A sheriff suspended a deputy without a prior hearing. A district judge decided that this omission violated the due process clause, and a jury assessed damages at $3,700. On March 19, 1990, the

court entered judgment; it denied all substantive post-trial motions on October 1, 1990, while giving the plaintiff extra time to file a petition for attorneys' fees. Defendants (the sheriff and the county government) appealed—contesting the order of October 1 and not the judgment of March 19. The court detected the problem and issued this order:

> A preliminary review of the short record indicates that the order appealed from may not be a final judgment within the meaning of 28 U.S.C. § 1291, Defendants-appellants attempt to appeal from a minute order entered on October 1, 1990.
>
> Generally, an appeal may not be taken in a civil case until a final judgment is entered on the district court's civil docket ... It does not appear that such a final judgment has been entered. Therefore, this appeal appears to be premature. Accordingly,
>
> IT IS ORDERED that defendants-appellants shall file ... a brief memorandum stating why this appeal should not be dismissed for lack of jurisdiction. A motion for voluntary dismissal pursuant to Fed.R.App.P. 42(b) will satisfy this requirement. Briefing shall be held in abeyance pending further court order.

Defendants had only to draw the court's attention to the final judgment of March 19. Although their notice of appeal pointed to the order of October 1, such a gaffe is not fatal. *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Cardoza v. CFTC*, 768 F.2d 1542, 1545–47 (7th Cir. 1985); cf. *Chaka v. Lane*, 894 F.2d 923 (7th Cir.1990). The lingering dispute about attorneys' fees also did not affect the finality of the judgment on the merits. *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988); *Continental Bank, N.A. v. Everett*, 964 F.2d 701, 702–03 (7th Cir.1992); *Exchange National Bank v. Daniels*, 763 F.2d 286 (7th Cir.1985).

██ Instead of explaining why we had jurisdiction, defendants dismissed their appeal. They came to rue the decision. In August 1991 the district court awarded plaintiff more than $43,000 as legal fees and expenses under 42 U.S.C. § 1988. Defendants' best chance to knock out this award is to challenge the underlying judgment. So in addition to taking an appeal (No. 91–2937) from the award of fees, defendants want us to reinstate their original appeal (No. 90–3425). They say that the appeal was dismissed because of judicial error and contend that we should rectify our blunder by reinstating the appeal, as we did in *Patterson v. Crabb*, 904 F.2d 1179 (7th Cir.1990).

What gall! Defendants filed a notice of appeal from an order that denied some pending motions and set a schedule to resolve the parties' dispute about attorneys' fees. Because the order appeared to be interlocutory, we gave appellants a choice: tell us why it was nonetheless appealable, or dismiss your appeal. They chose the latter option, explaining: "Defendants–Appellants agree that there is no final judgment order within the meaning of Federal Rule of Civil Procedure 58." This is *judicial* error? In *Patterson* the court dismissed an appeal, believing that the district court had yet to enter a judgment. "In fact, there was such an order; we had overlooked it." 904 F.2d at 1179. To relieve appellants of the consequences of this mistake, we recalled the mandate and reinstated the appeal. In *Patterson* the court dismissed the appeal; here appellants dismissed their own appeal. They chose unwisely, but the choice was theirs.

The order giving defendants the choice between explanation and dismissal was entered not by the judges but by the legal staff. Like most other appellate courts, ours attempts to identify jurisdictional problems promptly after an appeal is filed, to save everyone's time in the event that jurisdiction is missing—as it is in about a fifth of all appeals filed in this court.[†] The

---

† Of the 2,824 appeals this circuit terminated in 1990–91, 158 were dismissed by the court for want of jurisdiction before the parties exchanged briefs. Another 535 were dismissed by the appellant under Fed.R.App.P. 42. Many of these dismissals are precipitated by notices of the sort employed in this case. Another 303 cases were dismissed for want of prosecution,

staff attorneys examine the short record that district courts transmit with the notice of appeal and the jurisdictional statement that Circuit Rule 3(c) requires of all appellants. A quick review catches many problems but inevitably overlooks the solutions to some. Thus the role of the order to file jurisdictional memoranda: the staff identifies what looks to be a problem and asks the lawyers for their views, giving appellant the option of voluntary dismissal if counsel cannot find a solution. After counsel state their views, the legal staff gives the papers to the judges for decision. Counsel who surrender, neglecting research and dismissing appeals when they could have obtained judicial resolution, have only themselves to blame.

 A timely notice of appeal is essential to appellate jurisdiction. *Browder v. Director, Department of Corrections*, 434 U.S. 257, 98 S.Ct. 556, 54 L.Ed.2d 521 (1978). A notice of appeal filed and dismissed voluntarily is gone, no more effective in conferring jurisdiction on a court than a notice never filed. *Williams v. United States*, 553 F.2d 420 (5th Cir.1977). Attempts to resurrect notices of appeal must be treated the same as belated notices of appeal. The time limits for filing an appeal require the losing party to choose between accepting the judgment and pursuing appellate review. The loser may not dither. Filing and dismissing an appeal prevents appellate review, and we do not think that it should place the judgment in limbo—open to review whenever the losing side changes its mind. The structure of the rules is set against such delay and uncertainty.

 We asked defendants for authority that appellants may resurrect a notice of appeal after the time provided by Fed. R.App.P. 4 for commencing an appeal. They had none. Our research turned up one candidate, *Williams v. Boeing Co.*, 681 F.2d 615 (9th Cir.1982). The ninth circuit

did not mention the date of the motion to reinstate, which may have been filed within the time to take an appeal. It also did not discuss the source of its authority to reinstate the appeal, if the motion was filed after the time allowed for a notice of appeal; the panel gave no reason other than the tautology that, if it did not reinstate the appeal, the losing party would be stuck with the decision of the district court. More recently another panel of that court denied a motion to reinstate, remarking that voluntary dismissal places the parties in the position they would occupy if no appeal had been filed. *United States v. Holmes*, 1992 WL 102677, 1992 U.S.App. LEXIS 11588 (9th Cir.1992), an "unpublished" opinion that does not cite *Williams v. Boeing*. Whether or not *Williams v. Boeing* represents the law in the ninth circuit, it is inconsistent with *Williams v. United States* and the rationale of time limitations for pursuing appeals. We conclude that a notice of appeal voluntarily dismissed—even under a misapprehension of law—may not be reinstated. A motion to reinstate should be treated as a fresh notice of appeal, effective if time remains under Rule 4 and ineffective otherwise.

 Defendants are limited to challenging the award of attorneys' fees, which as they point out is almost 11 times the size of the judgment. District judges possess discretion to award fees exceeding the judgment. *Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986); *Ustrak v. Fairman*, 851 F.2d 983, 989 (7th Cir.1988). Although private parties looking only to their own interests would not invest more in litigation than the stakes of the case, the combination of self-interest with the American Rule on the allocation of legal costs means that people can get away with small offenses. A two-day suspension may be unconstitutional, but a few hours of legal time costs more than the wages lost. Section 1988 helps to discourage petty tyranny. Awarding the full cost of liti-

sometimes when the appellant did not respond to the jurisdictional notice. *Annual Report of the Director of the Administrative Office of the United States Courts*, Table B–5A (1991). Still more appeals are dismissed for want of jurisdic-

tion after briefing; the Administrative Office records these as terminations "on the merits" and so understates the number of cases with jurisdictional flaws.

gation, which looks excessive in the single case, is sensible because it aids in the enforcement of rules of law. *Kirchoff v. Flynn,* 786 F.2d 320, 327 (7th Cir.1986). Put another way: Monetary awards understate the real stakes. Judicial decisions have effects on strangers. This litigation was prosecuted by a lawyer retained by a union of public employees and stoutly resisted by the county. If as the defendants say "only" $3,700 was at stake, why the tenacious resistance? Defendants do not contend that the exertion on plaintiff's side was unreasonable in relation to the defense; no more is necessary to show that the judge acted within his discretion in awarding fees exceeding the monetary recovery.

■ Whether the record supports an award of the whole $43,000 is a different matter. Barrow protested his suspension in two forums: in addition to filing this suit under 42 U.S.C. § 1983, he sought relief from the Ford County Merit Commission, the local civil service commission. The Commission received written submissions and held a hearing; when the Commission's decision was adverse, Barrow sought review in the Circuit Court of Ford County. Barrow demanded compensation for at least some of the time his lawyer spent before the local commission and the state court. The district court granted this request. To be precise, the district court declined to direct counsel to segregate the time spent in the federal litigation from the time elsewhere, concluding that hours spent questing for state remedies are compensable unless "the time that plaintiff's counsel spent representing the plaintiff before the Merit Commission was so unrelated to the charges brought by the plaintiff in his complaint that it would be improper to compensate the plaintiff's lawyer for such work."

This remark, coupled with the court's citation to *Jackson v. Illinois Prisoner Review Board,* 856 F.2d 890, 894 (7th Cir. 1988), implies that the judge was thinking about a problem other than the one presented by Barrow's case. Suppose a complaint contains two legal theories, one of which prevails and the other of which fails. If in the end the plaintiff wins a full recovery, the court awards the full cost of the legal work, excepting only time spent so single-mindedly on the unsuccessful theory that it was "unrelated" to the successful one. So, too, with multiple factual claims. See *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); cf. *Texas State Teachers Ass'n v. Garland Independent School District,* 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). Barrow's lawyer pursued *claims* that may or may not have been related in the sense of *Hensley,* but defendants' objection was that Barrow wanted compensation for time in multiple *forums.*

■ Section 1988 permits a court to shift to defendant only those legal fees incurred in "proceedings to enforce" a few listed federal statutes. When proceedings in state courts or agencies are part of the "enforcement" of § 1983, then time reasonably devoted to them is compensable. *New York Gaslight Club, Inc. v. Carey,* 447 U.S. 54, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980). But rights under labor contracts and local civil service laws do not arise under the Constitution or federal statutes, and efforts to secure their benefits in state forums are not "proceedings to enforce" § 1983. *North Carolina Department of Transportation v. Crest Street Community Council, Inc.,* 479 U.S. 6, 107 S.Ct. 336, 93 L.Ed.2d 188 (1986); *Webb v. Dyer County Board of Education,* 471 U.S. 234, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985). Barrow's claim is all but a rerun of *Webb,* which held that time spent before a state administrative body to secure tenure rights established by state law may not be charged against the defendant under § 1988, even though the defendants' acts violated the Constitution along with state law. The district court must reevaluate the claim for fees, excluding time devoted to seeking remedies before the state commission and court.

■ The court also must reconsider the hourly rate of $135 for counsel's time. The only support for this rate was an affidavit from a member of the local bar that in the

Central District of Illinois the market rate for attorneys possessing the "experience, qualifications, reputation and ability" of plaintiff's lawyer is $135 per hour in civil rights cases. The district court relied on this affidavit without mentioning that plaintiff's lawyer revealed that the union paid him between $80 and $110 per hour for his work in this very case. Counsel conceded that this was the rate he regularly charged for his own services, and that he had never in his life received a fee exceeding $120 per hour. Perhaps *other* attorneys in central Illinois have market rates in the range of $135; rates vary with skill and the time a lawyer needs to accomplish a task. But *this* attorney had a market rate of $110 or less. "[I]t is not the function of judges in fee litigation to determine the equivalent of the medieval just price. It is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order." *In re Continental Illinois Securities Litigation*, 962 F.2d 566, 568 (7th Cir. 1992). See also, e.g., *Pressley v. Haeger*, 977 F.2d 295 (7th Cir.1992). No need to answer a hypothetical in this case, for we know what counsel *did* receive by selling his services in the market.

■ At oral argument counsel suggested that the fee he negotiated with the union was too low and that the full agreement called for $80–110 with certainty plus gravy if he won and could persuade the judge to award more. So stated, the arrangement is a form of contingent fee—a bonus for winning. There is much to be said for such arrangements, which reduce victims' costs of representation and load the expense of civil rights work onto those who have transgressed. After the district judge made his decision, however, the Supreme Court held that risk multipliers are forbidden under the fee-shifting statutes applicable to environmental cases. *Burlington v. Dague*, —— U.S. ——, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). The reasoning in *Dague* has nothing to do with the text or history of the particular statutes. The Court discussed fee-shifting statutes in general and observed that "our case law

construing what is a 'reasonable' fee applies uniformly to all of" the fee-shifting statutes. *Id.* —— U.S. at ——, 112 S.Ct. at 2641. *Dague* thus prohibits enhancements under § 1988.

■ A premium rate for civil rights cases, applicable only when the other side is paying, looks like nothing so much as a disguised multiplier. Judges must stick to the market rate for the attorneys' time— that is to say, the opportunity costs of their time, the rate they could receive in other engagements. Unless there is evidence that attorneys receive more per hour, from their own clients, in civil rights litigation than in other kinds of litigation—and this record contains no such evidence—the court must use the hourly rate for the attorney's regular legal services.

Lurking in the background is the possibility that Barrow's lawyer routinely charged his clients less than he could have obtained. Some lawyers dedicate their professional lives to causes they find admirable and worthy of support—to legal services for the poor, to the representation of unions. These lawyers are making contributions to their favored causes, not in money but in time. *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), holds that lawyers who donate their services at bargain rates to legal aid organizations may collect under § 1988 the fees they could obtain if the charitable element were removed. Likewise, *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (D.C.Cir.1988) (in banc), holds that lawyers who reduce their hourly rates when providing services to environmental plaintiffs may collect the market rate for the time—the rate that the solvent defendants would have paid for work of like quality. These cases, like our own opinion in *Continental Illinois Securities*, hold that the market rate of legal time is the opportunity cost of that time, the income foregone by representing this plaintiff. Using opportunity cost as the measure of legal services means that the value of the lawyer's gift inures to the favored cause, and not to the adversary in litigation.

One might reply that if ideology leads some lawyers to favor a particular clientele, and so reduces what these persons must pay for legal services, this is the market at work. The lawyers get consumption value out of working for certain clients and so charge less, just as lawyers who flock to Arizona for the desert air and scenery receive less per hour than those who must suffer a wind chill of $-50°$ along the lakefront of the Windy City. No one would dream of saying that the market rate of a lawyer in Phoenix who bills $200 per hour "really" is $300 per hour, because he could get this by braving the winters (and enduring the grind) of a corporate practice in Chicago. When defendants pay corporate rates to union lawyers, counsel receive a rare treat: psychic income they can spend. *Save Our Cumberland Mountains* drew a vigorous dissent along these lines from judges who would have followed rather than overruled *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C.Cir.1984).

What to make of the problem presented in *Save Our Cumberland Mountains* and *Laffey* is a question for another day. Barrow's lawyer does not contend that he reduces his rate to unions in order to support the cause of labor. He has non-labor clients, none of whom paid him more than $120 per hour during the period of this litigation. Computing his lawyer's market rate according to opportunity cost therefore does not assist Barrow. For all this record reveals, counsel would have provided legal services at $110 per hour or less to the meanest villain. The market rate for his time was not $135, and the district court accordingly may not charge his services to defendants at such a rate.

Appeal No. 90–3425 is (re)dismissed for want of jurisdiction. On appeal No. 91–2937, the award of fees is vacated, and the case is remanded for further proceedings consistent with this opinion.