QAD.INC., et al., Plaintiffs,

v.

ALN ASSOCIATES, INC., et al., Defendants.

No. 88 C 2246.

United States District Court, N.D. Illinois, E.D.

Nov. 3, 1992.

---

Thomas A. Lewry, Southfield, MI, for plaintiffs.

Robert E. Wagner, Joseph A. Fuchs, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

This long-pending and bitterly contested litigation has had a checkered history, beginning with the initial grant of preliminary injunctive relief in favor of plaintiffs qad.inc. and Pamela and Karl Lopker (collectively "qad," treated as a singular noun) against original defendants ALN Associates, Inc. and its then principals Sally and Mike Allen (collectively "ALN," also treated as a singular noun), a determination that this Court later found to have been the direct result of qad's improprieties and bad faith in conjunction with its attempted enforcement of its claimed copyrights. Most recently our Court of Appeals has affirmed this Court's dissolution of that preliminary injunction on the ground that it had been improvidently granted (974 F.2d 834 (7th Cir.1992)), while at the same time this Court has completed the evidentiary hearings needed to determine ALN's damages stemming from that wrongfully-induced injunction.[1]

In the meantime this Court has received and has ruled upon ALN's initial petition for fees to be paid by qad to ALN (the "First Fee Petition"). That ruling, embodied in this Court's June 10, 1992 memorandum opinion and order, 1992 WL 142648, has caused ALN to be reimbursed for a portion of its lawyers' services. Since then ALN has tendered its Second Fee Petition, in which it seeks payment for services rendered in connection with the damages hearing and in preparing the First Fee Petition. That current request has now been fully briefed by the parties.

This Court has long been of the view—for years before issuance of the *In re Continental Illinois Securities Litigation*, 962 F.2d 566 (7th Cir.1992) opinion by our Court of Appeals—that the market often dictates the best measure of reasonableness of an award where fee shifting is called for under the law.[2] If a lawyer has rendered services for his or her client with the expectation of payment, and if the client has paid or is committed to pay for those services—whether on an hours-times-hourly-rate basis or otherwise—and if it later turns out that the third party must make the client (or lawyer) whole by bearing that legal expense,[3] no good reason appears for going behind the arms-length resolution of the fee issue between lawyer and client.[4] Like most situations in our

---

1. This Court is now awaiting the parties' submissions of proposed findings of fact and conclusions of law on that last-mentioned subject.

2. See, e.g., *In re Telesphere Int'l Securities Litigation*, 753 F.Supp. 716, 719 (N.D.Ill.1990) for a brief statement of that proposition. In material part this opinion is an effort to integrate the several concepts expressed in bobtailed form in such cases as *Telesphere* and other opinions referred to there (e.g., those cited *id.* at 718).

3. It should not matter for this purpose whether the reason for such fee-shifting is rooted in (1) Fed.R.Civ.P. ("Rule") 11 or (2) 28 U.S.C. § 1927 ("Section 1927") or (3) a situation in which legal expense is a recoverable element of damages or (4) any one of a large number of other situations in which the so-called "American Rule" (under which each litigant is required to bear his, her or its own lawyers' fees) is not in fact the operative rule.

4. This opinion has used the term "arms length" even though this Court is of course well aware that most clients are not separately represented when they enter into the agreements by which lawyers' fees are established (one exception is the minority of cases in which a house counsel for a business concern chooses an outside law

society in which goods or services are bought and sold, the price reached as between willing buyer and willing seller is the presumptive hallmark of the reasonable price.

There are some great and obvious advantages to the use of market price where it is appropriate. No court looking at the matter in hindsight can really say whether the hours that are represented by the claimant law firm[5] as having been spent on legal activity (even apart from any questions of honesty in such record-keeping) were "reasonably" required, so as to represent the "right" number of hours for which the third party should pay. And as to the other component of an hourly-based fee, the determination of the "reasonable" market rate for a lawyer's services is by no means susceptible to an assuredly "right" answer (see, e.g., our Court of Appeals' recent opinion in *Barrow v. Falck*, 977 F.2d 1100, 1105 (7th Cir.1992)[6]).

Moreover, the very process of judicial intervention increases the costs to the parties (the fees-on-fees component) and to the system itself (the so-called satellite litigation problem). For a graphic illustration of both those phenomena, see this Court's extended opinions issued after a four-day evidentiary hearing on fees—followed by voluminous post-hearing submissions by the litigants—in *Brandt v. Schal Associates*, 131 F.R.D. 485 and 131 F.R.D. 512 (N.D.Ill.

1990), *aff'd*, 960 F.2d 640 (7th Cir.1992). So where fee-shifting has been found necessary, and where the factors are such as to make the market a reliable source of information, this Court's continuing sense of the matter is that the inquiry into the proper measure for such fee-shifting ought to begin and end right there.

Frequently, however, the test of the marketplace will not provide a suitable answer—or any answer at all—to the question of the reasonable lawyers' fee. In the class action or stockholders' derivative action, for example, it is not realistic to speak of the representative plaintiff or plaintiffs as having set the terms of the relationship in the expectation of bearing the tariff (a point well made in *Continental Illinois*, 962 F.2d at 572–73 and repeated in *Price v. Marshall Erdman & Assocs., Inc.*, 966 F.2d 320, 328 (7th Cir.1992)). Hence the courts have had to struggle with such issues as whether the "lodestar" is the right approach, whether multipliers are to be applied if the lodestar *is* the starting point, whether a percentage-of-recovery approach may be preferable, whether an auctioning-off of the legal representation may provide a better solution than the other methods, whether a new approach ought to be adopted by eliminating what is often the fiction that there is a real client in such actions—and the list goes on (see Jonathan Macey & Geoffrey Miller, *The Plaintiffs'*

firm and negotiates the fee arrangements on behalf of the house counsel's employer-client). Usually the outside lawyer—a fiduciary who normally owes a duty of undivided loyalty to the client—is in an inherent conflict of interest when dealing with the unrepresented client in setting fees, or even when rendering bills after the fee arrangements are established. Whenever lawyers engage in the unscrutinized internal review process of their own records in rendering a bill on an hourly basis, in part having to decide what expenditures of time (if any) should be discounted or written off entirely, only the lawyers' sense of fairness is available to provide any real control.

5. Again the text's reference to the law firm as "claimant" is not accidental, even though most statutes that provide for awards of attorneys' fees speak of an allowance to the "prevailing *party*" (see, e.g., 42 U.S.C. § 1988 (emphasis added)). In real world terms the lawyers are frequently the real parties in interest in the

amount to be awarded—and of course that is always true where the client does not have the wherewithal to pay for services and the lawyers must therefore look to the fee award as their only possible source of payment.

6. *Barrow* is one of the few opinions that recognizes—or perhaps more accurately, it is one of the few opinions that talks about—the notion that "market rate" is not necessarily an apt term for the number that shows up in affidavits about lawyers' prevailing hourly rates (at least that is so where the inquiry is as to the market rate for litigation such as a 42 U.S.C. § 1983 civil rights claim, where most often there is no real prospect of *any* recovery for plaintiff's lawyers except via a court-awarded fee). Yet the same perceptive judge who wrote *Barrow* had a week earlier been constrained to find such affidavits controlling as to market rates in a Section 1983 lawsuit, because the litigants had put in no other evidence on the issue (*Pressley v. Haeger*, 977 F.2d 295, 299 (7th Cir.1992)).

*Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U.Chi.L.Rev. 1 (1991) for a partial description of the available choices, made in the course of advocating a drastic revision of the whole class action concept).

There are other types of situations where the market is not reliable because it is not operating in the usual sense. Such express fee-shifting statutes as 42 U.S.C. § 1988 assure the "prevailing party" plaintiff (though not the "prevailing party" defendant) that an award of fees will be decreed as part of the relief.[7] That being the case, the lawyer who may view a 42 U.S.C. § 1983 case as an assured winner and whose own client has no interest in monitoring the fee (as any client would if the client were buying services in the traditional lawyer-client relationship) is without the normal incentives to spend only the amount of time that is commensurate with the amount of the claim discounted by its likelihood of success.

And the marketplace (as established between the lawyer and the client in the sense discussed earlier) also cannot be the sole determinant where it has already been decided in a matter that the lawyer will be entitled to reach into the adversary's pocket, not that of his or her own client, for payment of fees. Where for example Rule 11 or Section 1927 or some other sanctions provision is already in play and where the lawyer for the aggrieved party then renders further services afterwards, with both lawyer and client thus already having been assured that the fees will be shifted (or more accurately that the fees will be borne by the other side from the outset), the usual self-policing constraints no longer provide assurances of reasonableness.

Distressingly, judicial opinions rarely differentiate among the different situations that call for something other than the so-called American Rule under which the client pays his, her or its lawyer what they have agreed upon. Much of the mischief that has been engendered by the case law on the entire subject of attorneys' fees—and there is much, from the highest authority on down—is the product of a failure to recognize that the same label has been attached to fundamentally different situations that call for the application of fundamentally different principles to produce fundamentally different solutions.

So much for policy, which we must always be aware is not the province of the District Judge. Now to the practical application of the relevant principles to this case. It has already been said that this Court had earlier determined that part of the price that qad must pay for its improprieties is to make ALN whole for the legal expense that it had wrongfully been forced to incur as the result of that misconduct. Once that determination had been announced, ALN's lawyers could obviously have taken a different perspective from their earlier posture in the litigation, now viewing themselves as being in a no-lose situation in spending time in preparation for (and in the conduct of) the enforcement proceeding to determine ALN's damages flowing from the wrongful issuance of the preliminary injunction.[8]

That point has not of course been lost on qad's counsel. Their response to ALN's Second Fee Petition begins with the basic contention that ALN's request is vastly excessive in amount, then points to several specific instances of claimed overkill. As their Response at 2 (quoted verbatim) puts it in terms of particulars, after having stated qad's global complaint:

---

7. Just this Term the Supreme Court will be deciding whether an award of nominal damages makes the plaintiff a "prevailing party" for that purpose, entitled to collect a full fee calculated in the conventional way. *Estate of Farrar v. Cain*, 941 F.2d 1311 (5th Cir.1991), *cert. granted sub nom. Farrar v. Hobby*, — U.S. —, 112 S.Ct. 1159, 117 L.Ed.2d 407 (1992).

8. Here as in a few other respects, the analysis to this point somewhat oversimplifies the operation of rational economic judgments. ALN and its lawyers cannot be confident that they have an absolutely blank check from qad to fill out: They have always had to be aware of the risk of reversal on appeal. All the same, the presence or absence of constraints is much altered when someone is pretty certain to be working with someone else's dollars.

1. Specific fees that are excessive on their face.

2. ALN improperly asks qad to pay for work on issues where the Court has ruled against ALN.

3. ALN improperly asks qad to compensate it for work never used in this case.

4. ALN improperly asks qad to compensate ALN for work that ALN performed only because ALN misrepresented that it had produced documents in discovery when, in fact, it had not.

5. Finally, there are a number of miscellaneous items which either have no description or which do not seem to properly be included.

■ ALN has properly rejected qad's initial simplistic argument that because the period covered by the Second Fee Petition is roughly one-half of the period covered by the first one, the award should automatically be limited to be one-half of the amount that was earlier approved by this Court—$58,561.79 (50% of the earlier-approved sum of $117,123.58)—rather than ALN's currently requested $287,197.47 (exclusive of interest). It is indeed a total non sequitur for qad to urge that the extent and scope of legal services are to be viewed as wholly linear with time. Vastly more in the way of compensable services was unquestionably compressed into the second (and shorter) time frame, so that merely the lesser amount of elapsed time on the calendar should not serve as any predicate for a corresponding reduction of the requested amount of fees.

■ With qad's argument for a mechanistic chopping down of the fee thus eliminated out of hand, it is in order to look at the individual charges that have been challenged by qad. In those respects ALN has provided an item-by-item response, and it ends up by agreeing only to a minimal adjustment of $2,135.25. That agreed reduction would bring the requested amount (including interest) to $289,230.71, of which $211,322.33 is claimed by ALN's lawyers and $77,908.38 by the Coopers & Lybrand accounting firm retained as experts for the damages hearing. This Court finds that those responses by ALN are individually persuasive in terms of all that this Court has seen and heard in the course of living with this litigation.

Even so, if this Court were free as a discretionary matter to exercise a gestalt approach to the problem, it would be inclined to apply an across-the-board reduction of 10% to the requested amount because of the lack of market controls already referred to and a general sense that a tighter ship might have been run if such constraints were present. In saying that, this Court has consciously eschewed (despite the approval of a sampling procedure by our Court of Appeals in *Evans v. City of Evanston*, 941 F.2d 473, 476–77 (7th Cir.1991) and in *Continental Illinois*, 962 F.2d at 573) the often deceptive precision of sampling and reviewing segments of the services involved, then extrapolating to the entire fee request a percentage disallowance that has been obtained from that sample. Especially in situations where (as in this case) a fee request does not lend itself to carving out discrete elements with any degree of assurance (1) that they are representative of the whole and (2) that there is real validity to the retrospective review of individual time charges by an observer who necessarily looks in from the outside, we really deceive ourselves that the process is somehow scientific just because it can be carried out by the application of a mathematical operation. It may be more comforting because it has the *look* of objective rather than subjective evaluation, but that appearance is not the reality. And of course even a small error in dealing with the sample (something that will almost surely occur despite the most careful efforts at judicial review) is magnified enormously by the very process of extrapolation to the much larger total request for fees.

Where then does that leave us? This Court never knowingly opts for any procedure that has the appearance of the chancellor's foot at work, among other reasons because of the difficulty of intelligent evaluation if the outcome is ultimately presented to a reviewing court. But in candor *any*

result reached in the specific situation that is presented here—either a blanket approval of the fee request as tendered, or a 10% across-the-board reduction, or any attempted piece-by-piece review of the time slips— must produce a result that in some sense is arbitrary.

Because the message that appears to be emanating from our Court of Appeals is that the trial judge's general sense of the matter should not serve as the predicate for the kind of overall percentage reduction that would appear reasonable to this Court in this instance (see *Continental Illinois*, 962 F.2d at 570), it does not so rule.[9] As already stated, qad has launched one bogus full-scale attack on ALN's fee request—as though the calendar alone were a proper standard for evaluating the reasonable fee—together with a group of individual attacks. As to the latter, ALN has responded persuasively in light of this Court's knowledge and observation of the proceedings. That being so, ALN must be viewed as having borne its burden of proof.[10] qad is accordingly ordered to pay the sums of $211,322.22 to Wallenstein, Wagner & Hattis and $77,908.38 to Coopers & Lybrand, both by checks tendered to ALN's law firm on or before November 17, 1992.

---

**9.** What is said here should not be misunderstood as unduly critical of our Court of Appeals' position. It is surely just as frustrating for any appellate court to be asked to review a district court determination that does not appear to be rooted in objective standards (somewhat akin to the card game that author Mark Harris described in his fine novel *Bang the Drum Slowly* as TEGWAR, "The Exciting Game Without Any Rules") as it is for the district judge to attempt to arrive at a precisely correct result where so much imprecision and imperfection provides the grist for the decisional mill.

**10.** See *Gates v. Deukmejian,* 977 F.2d 1300, 1307–08 (9th Cir.1992), which has recently followed the lead of *Continental Illinois* in disapproving a district court's unexplained 10% across-the-board reduction in a fee request. Where as here this Court has found qad's blunderbuss attack on ALN's detailed submission to be unprincipled and therefore unpersuasive, and it has then reviewed qad's more focused objections in detail and found them wanting save in minimal part, this Court's resulting approval of ALN's slightly reduced request should not be vulnerable to a return to the drawing board such as that mandated in *Gates, id.* at 1309–10.