**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, et al., Plaintiffs–Appellees,**

**v.**

**CENTRAL CARTAGE COMPANY and Central Transport, Inc., Defendants–Appellants.**

**Nos. 94–3823, 95–1872 & 95–1976.**

United States Court of Appeals, Seventh Circuit.

Jan. 22, 1996.

Albert M. Madden (submitted), Central States, Southeast & Southwest Area Pension Fund, Rosemont, IL, for Plaintiffs–Appellees.

Charles C. Jackson, Mark A. Casciari, James L. Curtis, Seyfarth, Shaw, Fairweather & Geraldson, Leonard R. Kofkin, Donald J. Vogel, Fagel & Haber, Chicago, IL, Patrick A. Moran, Scott T. Stirling, Evans & Luptak, Detroit, MI, for Defendants–Appellants.

Before FLAUM, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

EASTERBROOK, Circuit Judge.

■ Following its victory on the merits of these appeals, see 69 F.3d 1312 (1995), the Central States Pension Fund requested an award of attorneys' fees under § 502(g)(2)(D) of ERISA, 29 U.S.C. § 1132(g)(2)(D). The district court awarded the Fund the fees incurred in that forum, concluding that the employers' position was not substantially justified, and the Fund submits that the appeal was no better justified. *Central States Pension Fund v. Joe McClelland, Inc.*, 23 F.3d 1256 (7th Cir.1994), supports that conclusion. See also *Continental Can Co. v. Chicago Truck Drivers Pension Fund*, 921 F.2d 126 (7th Cir.1990). In *Joe McClelland* we ordered an employer that took a position similar to that of Central Cartage to pay the Fund's legal expenses. The panel's inability to reach unanimous agreement about the best way to express the reason the employers lost should not disguise the fact that none of the judges thought the appeal "substantially justified." The Fund's motion therefore is granted.

■ What remains in dispute is the method of calculating the "reasonable attorney's fee" of which the statute speaks. The Fund is represented by staff counsel. Central Cartage insists that the award cannot exceed the Fund's out-of-pocket costs: the attorneys' salaries plus other actual expenses of its legal counsel's office. The Fund, by contrast, believes that it is entitled to recover the sum it would have paid had it hired outside counsel. The Fund relies on *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), which held that a litigant represented by a nonprofit legal aid society could recover fees computed at the market rate for similar legal work, even if that rate exceeded the salaries and expenses of staff counsel. The Court held in *Blum* that attorneys' fees statutes do not establish a version of cost-of-service ratemaking but look to market prices, which are set by voluntary transactions rather than the costs of production. Central Cartage wants us to put *Blum* aside in favor of *Devine v. National Treasury Employees Union*, 805 F.2d 384, 386–88 (Fed.Cir.1986); *Goodrich v. Department of the Navy*, 733 F.2d 1578, 1580–81 (Fed.Cir. 1984), and *National Treasury Employees Union v. Department of the Treasury*, 656 F.2d 848, 850–53 (D.C.Cir.1981), which adopted a cost-of-service approach to avoid any prospect that legal-fee awards would subsidize other aspects of the victor's business, something that these courts thought would conflict with the ethical principle that attorneys may not share their fees with nonlawyers. See ABA, *Model Rules of Professional Conduct* 5.4(a). (Central Cartage's papers in this case refer us to the employer's argument in a pending appeal, *Central States Pension Fund v. Mason & Dixon Lines, Inc.*, No. 95–2026, which has not yet been argued. Mason and Dixon Lines is a member of the same holding company structure as the employers in this case, so the briefs in that appeal, which we have read, contain full statements of our litigants' positions.)

Both of the Federal Circuit's decisions came after *Blum*, which that court distinguished on the ground that an award to a legal-services organization poses no risk of fee-splitting with nonlawyers. An award to a union (or presumably to a pension trust) may well provide such benefits. The Federal Circuit suggested that things might be otherwise if the union had a separate legal-services fund, which would be the recipient of any award. *Devine*, 805 F.2d at 388–89; *Goodrich*, 733 F.2d at 1581. Many organizations took the cue and established such funds. The D.C.Circuit—the author of the first case in this sequence—has held that a separate legal-services fund within a union may recover fees at the market rate, just like the legal-services organization in *Blum*. See *American Federation of Government Employees v. FLRA*, 944 F.2d 922, 934–38 (D.C.Cir.1991). Accord, *Curran v. Department of the Treasury*, 805 F.2d 1406 (9th Cir.1986). This may be a sound distinction, but Central Cartage encounters a deeper problem. Cases such as *Devine* and *Goodrich* have never represented the law in this circuit. We have twice held that organizations that include both lawyers and nonlawyers may recover fees at the market rate, whether they obtain legal services by the

hour in a spot market or by the year through employment contracts. See *Textor v. Northern Illinois University,* 711 F.2d 1387, 1396–97 (7th Cir.1983); *Illinois v. Sangamo Construction Co.,* 657 F.2d 855 (7th Cir.1981).

Whatever one can say about the policy behind the rule against fee-splitting, or the policy behind the rule permitting the recovery of fees, or the effect of a separate legal-costs fund, is beside the point. Most fee-shifting statutes, including ERISA, direct the award to the *litigant* rather than the lawyer. The litigant may compromise the claim over the lawyer's objection, or may elect not to petition for fees. See *Venegas v. Mitchell,* 495 U.S. 82, 110 S.Ct. 1679, 109 L.Ed.2d 74 (1990); *Evans v. Jeff D.,* 475 U.S. 717, 730, 106 S.Ct. 1531, 1539, 89 L.Ed.2d 747 (1986); *Zeisler v. Neese,* 24 F.3d 1000 (7th Cir.1994). The Court wrote in *Venegas,* 495 U.S. at 87–88, 110 S.Ct. at 1683: "Because it is the party, rather than the lawyer, who is so eligible, we have consistently held that fees may be awarded ... even to those plaintiffs who did not need them to maintain their litigation, either because they were fortunate enough to be able to retain counsel on a fee-paying basis [citation omitted] or because they were represented free of charge by nonprofit legal aid organizations [citing *Blum* ]." If the victorious litigant owns the money representing the market value of the legal fees, and may pocket the cash without remitting a cent to the lawyer—who may have agreed to work for less, or for free—it is hard to see how there can be a fee-splitting objection. The money is not the lawyer's to start with. A contract between lawyer and client may call for a particular distribution, may even assign the award to the lawyer, but how the litigant allocates the money between its legal budget and other endeavors is none of the court's business (provided it keeps its contracts). It is similarly irrelevant whether the award is based on a fee-shifting statute such as § 502(g)(2)(D) or a penalty provision such as Fed.R.Civ.P. 11; the litigant owns the award in either case, which overcomes all fee-splitting objections.

*Devine, Goodrich,* and *NTEU v. Department of the Treasury* disregard the principle that the litigant owns the award, and we decline to follow them. The market-rate standard of *Blum* controls. And the market rate, as *Blum* held, is the price similar services fetch when sold by the hour in transactions between solvent parties. So, for example, work by a law firm's associates for which clients will pay $125 per hour has a market value of $125 per hour, even if the law firm pays the associates only $75 per hour and distributes the rest to the partners as profit, or to the landlord as rent. Just so, *Blum* held, with services furnished by house counsel who receive an annual salary. Looking to the price of actual transactions in the market avoids the need to determine the full cost of in-house services, which includes not only lawyers' salary and out-of-pocket expenses but also the opportunity cost of their time. Lawyers who devote their time to one case are unavailable for others, and in deciding whether it is prudent to pursue a given case a firm must decide whether the cost—including opportunities foregone in some other case, or the price of outside counsel to pursue that other case—is worthwhile. Opportunity cost, rather than cash outlay, is the right way to value legal services. E.g., *Barrow v. Falck,* 977 F.2d 1100, 1105 (7th Cir. 1992); *In re Continental Illinois Securities Litigation,* 962 F.2d 566, 568–69 (7th Cir. 1992). The going rate for comparable legal services in the market reveals that cost directly, avoiding a complex inquiry that is in the end likely to produce a comparable figure.

Central Cartage has one additional argument. It attributes to *Gusman v. Unisys Corp.,* 986 F.2d 1146 (7th Cir.1993), and *Barrow v. Falck, supra,* the principle that the hourly fee a lawyer charges to the client is "the" market rate for the legal services in question, and it asks us to treat the salary of in-house counsel as that market rate. If that is indeed what *Gusman* and *Barrow* held, they would be in tension, if not conflict, with *Blum.* But it is not what our cases held. See *Johnson v. Lafayette Fire Fighters Ass'n,* 51 F.3d 726, 732 (7th Cir.1995). We concluded that a lawyer's *regular* hourly fee, one counsel would charge "to the meanest villain", *Barrow,* 977 F.2d at 1106, is the market rate for that lawyer's services. In

*Barrow* the union's lawyer had a low hourly rate for everything; that normal rate, we held, is the market rate. *Gusman* takes the same approach when the lawyer has a high hourly rate, which presumably reflects extra skills or productivity. Neither case questioned the holding of *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (D.C.Cir.1988) (en banc), that a litigant may recover fees measured by its attorney's usual hourly rate—the one solvent clients are willing to pay—even though the attorney has charged a lower fee in a particular case as a donation to the organization. That gift should enure to the intended recipient rather than to the adversary in litigation. See *Barrow*, 977 F.2d at 1105–06. Thus if the attorneys who work for the Central States Pension Fund are making it a gift by working for wages lower than those they could secure at large law firms, the value of that gift belongs to the Fund, which can capture it by an award of fees at market rates. The Fund pays the attorneys their salaries, and the bargain element goes toward the Fund's other operations. None of this reflects a belief that the Fund's attorneys are donating their services; for all we know, their pay is equal to what they could get in the corporate law departments of Central Transport and other employers. The point, rather, is that under *Blum* the wages of staff counsel do not matter; the court should make an award representing the cost the victorious litigant would have incurred to buy legal services in the market, no matter how the litigant actually acquired those services.

The Fund has 14 days to submit a statement of the market value of the legal services reasonably used in the course of this appeal. The employers have 14 days to respond, after which we will make an appropriate award.