In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 04-3993 & 05-1192

ARCHIE ROBINSON,

*Plaintiff-Appellee,*

*v.*

CITY OF HARVEY,

*Defendant-Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 3696—**Paul E. Plunkett**, *Judge.*

ARGUED DECEMBER 5, 2006—DECIDED JUNE 12, 2007

Before FLAUM, WOOD, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* This is quite a case. Soon after 19-year-old Archie Robinson was shot by a City of Harvey police officer who said he acted in self-defense because Robinson was pointing a gun at him, rumors began to circulate that the officer's story was a lie. The truth, according to the rumors, was that Robinson was unarmed and that a gun, alleged to be his and found at the scene, was planted by police to cover up an unjustified shooting. Whether the rumors were true or not was the subject of two civil jury trials (and, inferentially at least, one criminal trial), with the bottom line being that Robinson was framed. So what we have here is a rather explosive case. But we must put its interesting questions off to the side

(and perhaps they will stay there) for the time being, because the primary issue we must first address is a yawner:  appellate jurisdiction. Nevertheless, to put the dispute in context, we briefly recount a few of the facts (there are many more facts about which we will say nothing) that emerged from the lengthy litigation that grew out of Robinson's shooting.

Juries and judges often hear two sides of the same story. And so it is here. We start with the version advanced by the City of Harvey.

Manuel Escalante, a City of Harvey police officer, was working with a "gang and narcotics unit" on September 3, 1997. Two other officers, White and Williams, were with him. After arriving near the intersection of 147th and Vail Streets in Harvey, the officers separated, and a moment or two later Escalante saw two men (Robinson and Anthony Reynolds) running through a pathway between two buildings in the area of a six-foot-high fence. Escalante says he engaged Reynolds in a scuffle and that Robinson, who had been ordered to stop running, failed to do so and instead joined the scuffle by "jumping on top" of him. Robinson, after being pushed away, started to scale the fence and, while doing so, pulled out a handgun and pointed it at Escalante's face. Escalante ordered Robinson to "drop the gun" but he didn't comply. Escalante then fired one shot, in self-defense, which struck Robinson in the back buttocks area. Order was restored a short time after Robinson was hit.

According to Robinson, Escalante's claim is a pack of lies. Robinson says he and Reynolds were talking when they saw someone running towards them. They tried to flee. When they got to the fence, with Escalante in pursuit, Reynolds went over and Robinson got near the top. At that moment, Escalante shot him. Robinson said he didn't have a gun, never had any physical contact with Escalante, and no warning preceded the shot.

So, who is to be believed? Major cracks in Escalante's version of the event soon appeared. Williams, one of the officers with Escalante, told another officer (Jelenewski) that the Robinson shooting was "bogus." He said he never saw Robinson with a gun, saw none on the ground soon after the shooting, and didn't hear Escalante tell Robinson to "drop the gun."

And then there's the gun. The night before the shooting, Escalante, Williams, Jelenewski, and another officer, Edison Torres, participated in a raid in which a police report indicated that five guns were seized, though only four were accounted for at the police station and only three were eventually logged into evidence. What happened to the guns that were not accounted for? Williams said that he saw Torres approach Escalante inside the secured area of the Robinson shooting and that Torres later showed him that there was a gun on the ground. Torres denied showing Williams the gun, though the City's answers to interrogatories identify him as the person who found it. Finally, the gun recovered at the scene was a cheap model with a broken grip handle. It carried no usable fingerprints. It was the perfect candidate, according to Harvey's own police chief (Robinson says this occurred in "a moment of uncommon candor") to be used as a "drop gun" or a "throwaway gun."

Robinson was eventually charged with carrying a gun without the requisite paperwork. The prosecution introduced a gun into evidence but offered no witnesses to testify about its recovery, and Robinson was acquitted after a bench trial. He then sued Escalante and the City of Harvey, invoking Illinois common law and 42 U.S.C. § 1983 to allege malicious prosecution by Escalante and a violation of his constitutional right to not be the victim of excessive force.

A jury found for Robinson on the malicious prosecution claim but rejected his excessive force claim. Robinson

moved for a new trial, pointing out that the jury's malicious prosecution verdict required concluding that there was no probable cause to believe he had a gun, making it impossible to also find that Escalante's use of deadly force was reasonable under the circumstances. The district court agreed that the verdicts were fatally inconsistent, and on February 22, 2002, a new trial was ordered. The new jury found for Robinson on both counts, and he was awarded $275,000 in compensatory and punitive damages. He later petitioned for attorneys fees under 42 U.S.C. § 1988. When a new district court judge assigned to the case awarded approximately $375,000 in fees, Robinson moved for reconsideration, and on October 20, 2004, the judge reversed his decision and awarded some $507,000. Harvey now appeals both the district court's grant of a new trial and the fee award.

It goes without saying that a timely notice of appeal is essential to appellate jurisdiction, *Barrow v. Falck*, 977 F.2d 1100, 1103 (7th Cir. 1992). A party is generally required to file a notice of appeal with the district court within 30 days after the order appealed from is entered, *see* Fed. R. App. P. 4(a)(1)(A), although that time may be extended to a limited degree if a party moves for more time within 30 days after the original time period has expired—a situation not presented here. *See* Fed. R. App. P. 4(a)(5). Harvey filed its appeal on November 17, 2004 (Escalante has settled his part of the case), clearly giving us jurisdiction to consider the fee award. But as we shall see, we do not have jurisdiction to review the February 22, 2002, trial order.

Because the February 22 order granting the new trial was not appealable as a final order within the meaning of 28 U.S.C. § 1291, *Juneau Square Corp. v. First Wis. Nat'l Bank of Milwaukee*, 624 F.2d 798, 806 (7th Cir. 1980), Harvey's appeal on that issue is really an appeal of the July 30, 2002, judgment entered following the second trial.

Absent a valid extension, Harvey therefore had until August 29, 2002, to file a timely notice of appeal—a deadline two years before the November 2004 filing we now consider.

The City maintains that its time for appeal was validly extended under Federal Rule of Appellate Procedure (FRAP Rule) 4(a)(4)(A), which enumerates six categories of post-trial motions that when filed extend the appeal deadline until their resolution. Harvey first directs us to Rule 4(a)(4)(A)(iii), which describes what the Second Circuit has called a "Rule 58/54/59 order," *Mendes Junior Int'l Co. v. Banco Do Brasil*, 215 F.3d 306, 312 (2d Cir. 2000), a term we will use here. As explained by Rule 58(c)(2) of the Federal Rules of Civil Procedure (the Civil Rules):

> When a timely motion for attorney fees is made under Rule 54(d)(2), the court may act before a notice of appeal has been filed and has become effective to order that the motion have the same effect under Federal Rule of Appellate Procedure 4(a)(4) as a timely motion under Rule 59.

The City argues that a December 17, 2002, minute order granting Harvey's motion to extend the time for appeal was a proper Rule 58/54/59 order that, in accordance with FRAP Rule 4(a)(4), delayed the running of the time for appeal of the new trial order until Robinson's fee motion was finally resolved on October 20, 2004.

But there are several flaws in this argument. First, the plain language of Rule 58(c)(2) only authorizes the court to make a Rule 58/54/59 order "[w]hen a timely motion for attorney fees is made." At the time of the December 17 order, Robinson had not yet made his fee motion (he did not do so until August 14, 2003), meaning that the district court lacked the authority to enter the order (insofar as it dealt with extending the time to appeal) in the first place. *Mendes*, 215 F.3d at 313.

Second, the December 17 Rule 58/54/59 order was entered long after the August 29 deadline. Harvey suggests that this is not a problem because the district court's Local Rule 54.3(b) extends to 90 days the Rule 54(d)(2)(B) default rule providing a 14-day time period after judgment is entered to file a fee petition. But that argument ignores both that Local Rule 54.3(c) expressly provides that "[t]he filing of a fee motion shall not stop the running of the time for appeal of any judgment on which the motion is founded," and that Civil Rule 58(c)(1) makes clear that the time for appeal cannot be extended in anticipation of a fee petition. More generally, Harvey's theory neglects the well-established principle that "[t]he power of the federal courts to extend the time limits on the invocation of appellate jurisdiction is severely circumscribed." *Mendes*, 215 F.3d at 312. In the end, the City can prevail only if we read Rule 58(c)(2) to permit a district court judge to enter a Rule 58/54/59 order anytime after a fee petition has been filed and is still pending, regardless of whether the 30-day time period to appeal the judgment has already passed. In other words, we would have to conclude that the district court has the power to revive the already-expired time for appeal—a position rejected by the Second Circuit in *Mendes* and one we likewise decline to take.

As *Mendes* noted, the language in Rule 58(c)(2) that "the court may act before a notice of appeal has been filed and has become effective," strongly suggests that the rule's drafters intended a court's authority to enter a Rule 58/54/59 order to depend on the possibility that a notice of appeal may yet become effective—something that is impossible once the time for appeal prescribed by FRAP Rule 4(a)(1)(A) has expired. 215 F.3d at 313. Furthermore, "if . . . the drafters meant that a Rule 58/54/59 order itself would have the effect of reviving

an already expired right to appeal, we surely would have expected Rule 58 or FRAP Rule 4(a) to state that effect with some clarity[1]." *Id.*

It is worth mentioning, as the *Mendes* court did, that the provision in Rule 58 granting the district court the authority to enter a Rule 58/54/59 was added by 1993 amendments to the rule and motivated by the desire to give courts the option to delay a merits appeal until fee issues were resolved where it was efficient to do so. Fed. R. Civ. P. 58 advisory committee's note (1993); *see also Mendes*, 215 F.3d at 313-14. Although the courts of the Northern District of Illinois still have this option (because they can always set their own fee petition filing schedule), the local rules, as they are authorized to do, *see* Fed. R. Civ. P. 54(d)(2), have selected a different default position that gives parties 90 days to file a fee petition, *see* N.D. Ill. Local R. 54.3(b), presumably to encourage parties to resolve fee disputes outside of the courtroom. By also expressly divorcing the timetable for filing fee petitions from the time to appeal, *id.* 54.3(c), the Northern District has concluded that it is worth encouraging out-of-court agreement over fees even if a litigating party may be required (where there ultimately is no settlement) to file separate notices of appeal on the merits and on fees. Considering that the courts of appeals can choose (as we often do) to consolidate the two, we see no reason to

---

[1] We note also that FRAP Rule 4(a)(6) already comprehends revival of the time for appeal and makes no mention of using a Rule 58/54/59 order to do so. The rule allows a district court to reopen the time for appeal only for a period of no more than 14 days and only in cases where no party is prejudiced and the moving party (1) did not receive proper notice of the entry of judgment and (2) filed a motion no later than 180 days after judgment is entered.

second-guess the Northern District's choice and are therefore unpersuaded—particularly in light of the long-recognized public interest in the finality of litigation—that we should read the rules to authorize a district court judge to revive the time for appeal through a Rule 58/54/59 order.

The City also tries another tack, arguing that Escalante made a timely Rule 59 motion that extended his time to appeal under FRAP Rule 4(a)(4)(A)(iv). If that motion was timely, Harvey contends, its time for appeal was delayed until the district court resolved that motion on July 18, 2003, at which time the City had already made its motion for a Rule 58/54/59 order. If this scenario is embraced, that order was appropriate notwithstanding our endorsement of *Mendes*, because under FRAP Rule 4(a)(4) these kinds of post-judgment motions are strung together to extend the appeal time until all are resolved.

But this argument also fails, because Escalante never made a timely Rule 59 motion—the conclusion the district court reached in its July 18 memorandum opinion and order. Rule 59 motions must be made within 10 days of the entry of judgment, *see* Fed. R. Civ. P. 59(b)—a time limit that cannot be extended. *See* Fed. R. Civ. P. 6(b). Escalante did not file his written Rule 59 motion until August 21, 2002, well after the 10-day deadline had expired. The City argues that Escalante made a timely *oral* motion to amend the judgment when he informed the court on multiple occasions that he would be requesting a reduction in the damages award, but even if a Rule 59 motion can be made orally (a question we need not answer today), the district court's minute order of July 24 makes clear that no motion was made: it sets a future hearing date for Escalante to demonstrate his financial condition "in *anticipation of a motion* for remittitur of punitive damages" (emphasis added). Escalante made no motion until August 21, at

which point it was too late; there could be no valid extension of the deadline to appeal.

Harvey, as a last gasp, turns finally to the doctrine of "unique circumstances," which applies "where a party has performed an act which, if properly done, would postpone the deadline for filing his appeal and has received *specific assurance* by a judicial officer that this act has been properly done." *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 179 (1989) (emphasis added). Harvey argues that an exchange between the district court judge and defense counsel on the day judgment was entered after the second trial provided the requisite "specific assurance" that the time to appeal could be extended:

MS. BUDZINSKI [Escalante's counsel]: Your Honor, I'm going to ask if we can have additional time to file our post-trial motions. We have ten days under the rules, and I am out of the office Friday, the 2nd, and then the next the 7, 8th, and 9th on vacation that I have had planned for several months. And I don't know what Mr. DiCianni's schedule is. But I don't know if plaintiff would object.

THE COURT:  To deferring?

MS. BUDZINSKI:  Pardon?

THE COURT:  What—

MS. BUDZINSKI:  If we could have additional time other than the ten days. If it is agreed by the parties or ordered by the Court, we still preserve our issues on appeal.

THE COURT:  I can extended the time you're telling me. Okay.

MS. BUDZINSKI:  Even to August 16th. I don't know if that would be—give us an additional week, August 16th or maybe August 21st, your Honor.

THE COURT:  All right. Let's say August 21 to file post-trial motions.

MR. TOOTOOIAN [City of Harvey's counsel]:  But the date of July 30th remains as the judgment on the verdict date?

THE COURT:  Yes.

MS. BUDZINSKI:  But we were still protected for appeal with your order—

MR. TOOTOOIAN:  We are getting an extension now—

MS. BUDZINSKI:  To file post-trial motion, and that protects us for appeal.

THE COURT:  That's correct.

MS. BUDZINSKI:  Okay.

"We have taken a narrow view of the *Osterneck* rule, lest it become an exception that swallows the rules concerning time for appeal." *Properties Unlimited, Inc. Realtors v. Cendant Mobility Servs.*, 384 F.3d 917, 921 (7th Cir. 2004); *see also Talano v. Northwestern Med. Faculty Found.*, 273 F.3d 757, 761 (7th Cir. 2001); *Hope v. United States*, 43 F.3d 1140, 1143 (7th Cir. 1994); *Green v. Bisby*, 869 F.2d 1070, 1072 (7th Cir. 1989). Indeed, the doctrine's continued validity has been seriously questioned both in this court, *see Varhol v. Nat'l R.R. Passenger Corp.*, 909 F.2d 1557, 1573 (7th Cir. 1990) (en banc) (Manion, J., joined by Cummings, Posner, Coffey, and Easterbrook, JJ., and Eschbach, Senior J., concurring), and in the Supreme Court, *see Houston v. Lack*, 487 U.S. 266, 282 (1988), (Scalia, J., joined by Rehnquist, C.J., and O'Connor and Kennedy, JJ., dissenting), prompting the observation that "[t]he 'unique circumstances' doctrine is, at best, on life support." 16A Charles Alan Wright, Arthur R. Miller, &

Edward H. Cooper, *Federal Practice & Procedure* § 3950.3 (3d ed. supp. 2006).

As we explained in *Properties Unlimited*, the unique circumstances exception is available "only when there is a genuine ambiguity in the rules to begin with, and the court resolves that ambiguity in the direction of permitting additional time to appeal." 384 F.3d at 922. Applying the doctrine more broadly would be to hand over to the district court the discretionary authority to disregard the rules whenever it was convenient by affirmatively declaring the deadline extended and assuring the parties that they could proceed according to a new timetable. Such an interpretation would strip the rules of their mandatory quality.

There is nothing ambiguous in the language of the rules at issue here. The plain language of FRAP Rule 4 clearly delimits the only situations in which the time to appeal can be validly extended, and Civil Rule 6(b) expressly precludes judges from extending the time to make a Rule 59 motion. We therefore decline to apply the unique circumstances exception in this case.

We are thus left only to review the merits of the district court's fee award. Under 42 U.S.C. § 1988, the district court may "in its discretion" award attorneys fees to the prevailing party in a civil rights action. The amount of the award is determined by calculating a lodestar after looking to "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The lodestar amount may then be revised in either direction upon consideration of a host of additional factors. *Id.* at 430 n.3.

Robinson originally sought $671,677.50 for 2372.3 hours of work performed by seven attorneys. Before his fee motion was considered, however, the original district court judge (the Honorable Joan Humphrey Lefkow) recused herself and the case was transferred to District Judge Paul

E. Plunkett. In determining the lodestar, Judge Plunkett concluded that Robinson's requested figure was too high, due in large part to the counting of certain time entries that either indicated unreasonably duplicative work by Robinson's attorneys or were simply too vague to be relied on. Judge Plunkett then settled on a lodestar of $562,757.75. The judge then revised the lodestar amount downward by one-third, explaining that the questions presented by the case were not particularly difficult. Robinson was awarded $375,171.84 plus a small sum for expenses.

Robinson promptly moved for reconsideration of the lodestar reduction and argued that his original fee petition had taken into account Judge Lefkow's (the trial judge) knowledge of the complexities and pretrial preparation of the case, such that Judge Plunkett may have inevitably misunderstood critical facts when making his ruling. On reconsideration, Judge Plunkett granted Robinson's motion and agreed that because he had not witnessed the events of the trial he did not properly appreciate the complexity of the case and the need for extensive trial preparation by Robinson's counsel. After also correcting for a mathematical error in his earlier ruling, he awarded Robinson the full lodestar amount of $507,183.94 in fees and expenses.

The City challenges this revised decision and argues that the judge improperly evaluated the reasonableness of the lodestar amount by (1) considering factors other than the degree of success obtained by Robinson, and (2) failing to provide a basis for overturning its previous finding that Robinson had achieved only modest success.

An award of the originally calculated lodestar amount is presumptively reasonable, *Blanchard v. Bergeron*, 489 U.S. 87, 95 (1989), and it is the City's burden to convince us that a lower rate is *required*. *People Who Care v. Rockford Bd. of Ed.*, 90 F.3d 1307, 1313 (7th Cir. 1996). That is,

because fee award determinations are inherently fact-intensive, we review them under the highly deferential "abuse of discretion" standard. As we explained in *Herbst v. Ryan*,

> The district court is accorded significant deference in fee matters because (1) it possesses "superior understanding of the litigation and [there exists a] desirability of avoiding frequent appellate review of what essentially are factual matters"; (2) the need for uniformity in attorneys' fees awards is not great enough to warrant appellate review of minutia; and (3) the desirability of avoiding "a second major litigation" strictly over attorneys' fees is high.

90 F.3d 1300, 1304 (7th Cir. 1996) (alteration in original) (citations omitted).

We have no trouble concluding that the award of the full lodestar amount was not clearly erroneous. First, the City's argument regarding the court's reliance on improper factors fails to appreciate that it was primarily these factors that the court used to justify the original downward revision of the lodestar—the decision they now seek to reinstate. In other words, if the City is right about the propriety of the district court's analysis, it is the downward revision and not the grant of the full lodestar that should concern us.

Moreover, we do not agree that the degree of Robinson's success in the litigation *required* the district court judge to lower the fee award. After the second trial, judgment was entered in favor of Robinson on both counts against both defendants, and he was awarded $25,000 in compensatory damages and $250,000 in punitive damages. The City argues that this "minimal" recovery did not constitute success warranting an award of the full lodestar amount, especially considering that Robinson asked for more. But

$275,000 is hardly "minimal," and in any event the vindication of Robinson's constitutional rights "cannot be valued solely in monetary terms." *City of Riverside v. Rivera*, 477 U.S. 561, 574-77 (1986). He effectively persuaded a jury that a significant number of City of Harvey officials conspired to plant a gun at the crime scene—a victory that serves the public interest by exposing to light disturbing police malfeasance and grave municipal institutional failures, and one that will presumably help to deter future constitutional violations by the City's officers. These achievements are anything but minimal.

The appeal of the district court's July 30, 2002, judgment is DISMISSED, and the October 20, 2004, order awarding attorneys fees is AFFIRMED.

A true Copy:

      Teste:

                   _____

                   *Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—6-12-07